# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| 9050 Danbridge Street, Pico Rivera, CA 90660 | ) ) ) ) | Case No. 2:23-MJ-6359-DUTY |

FILED
CLERK, U.S. DISTRICT COURT

12/12/2023

CENTRAL DISTRICT OF CALIFORNIA
BY Velicia Marrer DEPUTY

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-2*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B1*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(a)(1)(A) | Engaging in the Business of Unlicensed Firearms Dealing |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/
_____
*Applicant's signature*

ATF Special Agent Ani Ghaltakhchyan
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 12/12/23

_____
*Judge's signature*

City and state: Los Angeles, CA

Hon. ~~Jacqueline Chooljian,~~ Charles F. Eick U.S. Magistrate Judge
*Printed name and title*

AUSA: LAURA A. ALEXANDER

<u>**ATTACHMENT A-2**</u>

The premises to be searched is located at 9050 Danbridge Street, Pico Rivera, CA 90660 (the "SUBJECT PROPERTY 2"), including all guesthouses, annexes, attics, porches, garages, carports, the outside yard (including all sheds or storage spaces), mailboxes, trash containers, debris boxes, and vehicles parked in the garage or driveway.

SUBJECT PROPERTY 2 is tan single-story home, with white accents.  The number "9050" is displayed to the left of the front door.  SUBJECT PROPERTY 2 is depicted in the image below:



**ATTACHMENT B1**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations by GUTIERREZ and ACEVES (the "Target Subjects") of 18 U.S.C. § 922(a)(1)(A) (the "Subject Offense"), namely:

a.   Any firearm, ammunition, and firearm-related items, such as magazines, holsters, silencers, magazine extenders, firearm-building kits, firearm and/or ammunition boxes or bags, or shell casings;

b.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

c.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violation;

d.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype,

and WhatsApp), SMS text, email communications, or other
text or written communications sent to or received from any
digital device and which relate to the above-named
violation;

e.    Records, documents, programs, applications,
materials, or conversations relating to the sale or
purchase of guns or ammunition, including correspondence,
receipts, records, and documents noting prices or times
when guns or ammunition were bought, sold, or otherwise
distributed;

f.    Records related to the use, concealment,
diversion, disbursement or other transfer of proceeds
related to the Subject Offense;

g.    Items used in the packaging of currency for
consolidation and transportation, such as money-counting
machines, money wrappers, carbon paper, rubber bands, duct
tape or wrapping tape, plastic wrap or shrink wrap, and
plastic sealing machines;

h.    United States currency over $1,000 or bearer
instruments worth over $1,000 (including cashier's checks,
traveler's checks, certificates of deposit, stock
certificates, and bonds) (including the first $1,000), and
data, records, documents, or information (including
electronic mail, messages over applications and social
media, and photographs) pertaining to, obtaining,
possessing, using, applications for, or transferring money

x

over $1,000, such as bank account records, cryptocurrency records and accounts;

      i.   Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of firearms and ammunition, or firearms customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when firearms were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

      j.   Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of firearms and/or ammunition;

      k.   Contents of any calendar or date book;

      l.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

   2.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense, and forensic copies thereof.

3.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

b.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.   evidence of the attachment of other devices;

d.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.   evidence of the times the device was used;

f.   applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

g.   records of or information about Internet Protocol addresses used by the device.

4.   As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents,

programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

5.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.   <u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>

6.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the

device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant. The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase,"

"Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the scope of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing

retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

       h.  After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

    7.  The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

    8.  During the execution of this search warrant, law enforcement is permitted to: (1) depress the Target Subjects' thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the Target Subjects' faces with their eyes open to activate the facial-, iris-, or retina-recognition feature, in order to

gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

9.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**AFFIDAVIT**

I, Ani Ghaltakhchyan, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so employed since June 2021. I am currently assigned to the Glendale Field Office of the Los Angeles Field Division of ATF, which conducts investigations into violations of federal firearms, explosives, and narcotics laws.  My experience as an ATF SA includes, but is not limited to, conducting physical surveillance, executing search and arrest warrants, and participating in controlled drug/gun purchases using informants. I have experience investigating violations of federal statutes governing firearms and narcotics.  I have also conducted surveillance of individuals trafficking firearms and illegal controlled substances, and persons possessing illegal firearms.

2.   As part of my training, I attended the Criminal Investigator and Special Agent Basic Training Academies for ATF at the Federal Law Enforcement Training Center in Glynco, Georgia for approximately 27 weeks.  This training included instruction on federal and state firearms and narcotics laws and regulations.

3.   I graduated Magna Cum Laude with a Bachelor's degree in Criminal Justice and Law in Society from California State University, Los Angeles.  During my education, I completed a two-year internship with the United States Marshals Service

("USMS") in Los Angeles, CA.  During that two-year period, I spent six months at the USMS Fugitive Apprehension Task Force where I was trained to use databases such as the National Crime Information Center, to gather background information on the subjects of investigations.

## II.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint against and arrest warrants for: (1) ANTHONY GUTIERREZ ("GUTIERREZ") and ANTONIO ACEVES, JR. ("ACEVES") for a violation of 18 U.S.C. § 922(a)(1)(A) (Engaging in the Unlicensed Business of Firearms Dealing); (2) MILTON JAVIER MARTINEZ and DANIEL FITZPATRICK TRAUB ("TRAUB"), for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 18 U.S.C. § 2(a) (distribution of methamphetamine); (3) PEDRO GALLARDO, also known as "Mono" ("GALLARDO") for a violation of 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm).

2.    GUTIERREZ, ACEVES, GALLARDO, MARTINEZ, and TRAUB are collectively referred to in this application as the "Target Subjects."

3.    This affidavit is also made in support of warrants to search the following persons and properties:

a.    2410 E 115th Street, Los Angeles, CA 90059 ("**SUBJECT PROPERTY 1**") as described more fully in Attachment A-1;

b.    9050 Danbridge Street, Pico Rivera, CA 90660 ("**SUBJECT PROPERTY 2**") (together with **SUBJECT PROPERTY 1**, the "SUBJECT PROPERTIES"), described in Attachment A-2; and

     c.   The persons of:

         i.   GUTIERREZ, described in Attachment A-3;

         ii.  ACEVES, described in Attachment A-4;

         iii. GALLARDO, described in Attachment A-5;

         iv.  MARTINEZ, described in Attachment A-6;

         v.   TRAUB, described in Attachment A-7; and

4.   a 2014 Black Kia Sedan bearing California license plate 8UVN169, with Vehicle Identification Number KNAFX4A68E5190234 (the "SUBJECT VEHICLE"), described in Attachment A-8.

5.   The requested search warrants for SUBJECT PROPERTY 1, SUBJECT PROPERTY 2, and the persons of GUTIERREZ and ACEVES seek authorization to seize evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 922(a)(1)(A) (Engaging in the Unlicensed Business of Firearms Dealing) (the "Subject Offense"), as further described in Attachment B1. The requested search warrants for the person of GALLARDO seeks authorization to seize evidence, fruits, and instrumentalities of a violation of 18 U.S.C. § 922(g)(1) (Being a Felon in Possession of a Firearm), as further described in Attachment B2. The requested search warrants for the persons of MARTINEZ and TRAUB seek authorization to seize evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841(a)(1) (Distribution of Methamphetamine) and 18 U.S.C. § 2(a) (Aiding and Abetting), as further described in Attachment B3. Attachments A-1 through A-8 and B1 through B3 are incorporated herein by reference.

6.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint and
warrants and does not purport to set forth all of my knowledge
of or investigation into this matter.  Unless specifically
indicated otherwise, all conversations and statements described
in this affidavit are related in substance and in part only, and
all dates and times are on or about those indicated.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

4.    From March to July 2023, Cecilio HERNANDEZ, also known
as "Chilo" ("HERNANDEZ")[1], brokered firearms sales and a
methamphetamine sale to an ATF Confidential Informant[2] ("CI").
The controlled purchases took place at locations in Pasadena,
CA, Temple City, CA and Azusa, CA.  For each of the controlled
purchases, HERNANDEZ used his Instagram accounts to contact the
CI, negotiate prices for the firearms and methamphetamine, and
arrange for meeting times and places.

5.    Through these controlled purchases, HERNANDEZ
introduced the CI to MARTINEZ on May 9, 2023; and GALLARDO on
June 23, 2023.  MARTINEZ then introduced the CI to TRAUB on May

---

[1] HERNANDEZ died in approximately October 2023.

[2] The CI has worked for ATF since 2011.  S/he was previously
convicted of Racketeer Influenced and Corrupt Organizations Act
conspiracy in 2010, and possession of controlled substances in
1996 and 1997.  The CI works for compensation, and ATF has paid
him/her approximately $257,350 to date.  Since the CI began
working for the ATF in 2011, the CI has provided reliable and
trustworthy information.

9, 2023.  Further, GUTIERREZ learned of the CI's Instagram account from HERNANDEZ after HERNANDEZ brokered a firearm deal between GUTIERREZ and the CI on June 22, 2023.

6.     On May 9, 2023, HERNANDEZ and MARTINEZ both brokered TRAUB's sale of 113.7 grams of methamphetamine to the CI, in exchange for $500.  HERNANDEZ told the CI where to meet him for this deal, and after meeting in Pasadena, CA, HERNANDEZ introduced the CI to MARTINEZ.  MARTINEZ then introduced the CI to TRAUB, who took $500 from the CI and provided the CI with approximately 113.7 grams of methamphetamine.  TRAUB also provided MARTINEZ with approximately three grams of suspected methamphetamine for brokering the deal.  This controlled purchase is video and audio recorded.

7.     On June 23, 2023, HERNANDEZ brokered a three-firearms deal between GALLARDO and the CI.  HERNANDEZ, GALLARDO, and the CI arrived at the deal location in Azusa, CA, and GALLARDO and the CI then walked to a storage unit where GALLARDO retrieved three firearms for the CI, which the CI purchased for $4,000. An ATF interstate nexus expert determined that these three firearms traveled in interstate commerce.  As discussed below, GALLARDO is a convicted felon.

8.     On July 5, 2023, GUTIERREZ sold another firearm to the CI for $1,400 in Los Angeles, CA.  Agents saw GUTIERREZ drive a silver Chevrolet Malibu, with license plate number 8EIH649, registered to him at **SUBJECT PROPERTY 1**, from **SUBJECT PROPERTY 1** to the deal location in Los Angeles, CA.

9.    Instagram records show that between July 19, 2023, and July 22, 2023, GUTIERREZ discussed firearms sales, via Instagram direct messages, with the user of the account @tonelokz, later identified as ACEVES.  ACEVES sent pictures of firearms to GUTIERREZ, via Instagram, and GUTIERREZ then sent these same pictures to the CI on July 19, 2023.  GUTIERREZ ultimately sold two of the pictured firearms to the CI on July 27, 2023, and the firearms sold to the CI matched the appearance of the firearms from ACEVES' photographs.

10.    On August 9, 2023, GUTIERREZ brokered a four-firearms deal between ACEVES and the CI.  GUTIERREZ met the CI in Los Angeles, CA, to provide the CI with the firearms in exchange for $4,400.  Instagram records show that ACEVES supplied at least one of the three firearms at this deal, and ATF agents also observed GUTIERREZ speak with the driver of a car registered to ACEVES near the deal location after the deal.

11.    From December 4 to 7, 2023, ATF agents conducted surveillance at **SUBJECT PROPERTY 1** and **SUBJECT PROPERTY 2**. Based on observations during this surveillance, as well as my review of cell site location data for GUTIERREZ's cell phone, which was obtained through a warrant authorized by the Honorable Honorable Maria A. Audero on December 7, 2023, I believe that GUTIERREZ resides at **SUBJECT PROPERTY 1** and ACEVES resides at **SUBJECT PROPERTY 2**.

12.    Accordingly, there is probable cause to believe that: (1) GUTIERREZ and ACEVES violated 18 U.S.C. § 922(a)(1)(A) (Engaging in the Unlicensed Business of Firearms Dealing); (2)

MARTINEZ and TRAUB violated 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 18 U.S.C. § 2(a) (distribution of methamphetamine); and (3) GALLARDO violated 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm).  There is also probable cause to believe that the items listed in Attachment B1, which constitute evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 922(a)(1)(A) will be found in **SUBJECT PROPERTY 1**, as described in Attachment A-1, **SUBJECT PROPERTY 2**, as described in Attachment A-2, on the person of GUTIERREZ, as described in Attachment A-3, and on the person of ACEVES, as described in Attachment A-4.  There is also probable cause to believe that the items listed in Attachment B2, which constitute evidence, fruits, and instrumentalities of a violation of 18 U.S.C. § 922(g)(1) will be found on the person of GALLARDO.  Finally, there is also probable cause to believe that the items listed in Attachment B3, which constitute evidence, fruits, and instrumentalities of violations of 21 U.S.C. 841(a)(1) and 18 U.S.C. 2(a) will be found on the persons of MARTINEZ and TRAUB.

## IV.   <u>STATEMENT OF PROBABLE CAUSE</u>

13.  Based on my review of ATF law enforcement reports of the incidents below, my review of audio and video recordings of these incidents, my conversations with other law enforcement officers, and my personal involvement in the investigation, I know the following:

**A.   March and April 2023: HERNANDEZ Sold Firearms to an ATF Confidential Informant in Pasadena, CA**

14.   On or about March 7, 2023, I received information from Pasadena Police Department ("PPD") Detective Alex Torres regarding HERNANDEZ.  Detective Torres informed me that HERNANDEZ was possibly selling firearms without a license.

15.   In March and April, 2023, HERNANDEZ sold a total of three firearms to the CI, including: (1) a Smith & Wesson, model 649-2, .380 caliber revolver with serial number BNU3185; (2) a Hi-Point, model CF380, .380 caliber pistol, with serial number P8134665; and (3) a pistol with an unknown manufacturer, model, and serial number.

16.   In October 2023, an unknown individual shot and killed HERNANDEZ.  For purposes of this affidavit, information related to HERNANDEZ will be included only where relevant to the determination of probable cause for MARTINEZ, TRAUB, GALLARDO, GUTIERREZ, and ACEVES.

**C.   May 9, 2023: HERNANDEZ Introduces the CI to MARTINEZ, Who Then Brokers TRAUB's Sale of Methamphetamine to the CI**

17.   On May 8, 2023, the CI messaged HERNANDEZ on Instagram and asked HERNANDEZ if he had anything new.  HERNANDEZ then replied and sent pictures of three firearms, which he indicated he would sell for $3,000.

18.   The following day, the CI agreed via Instagram messaging to meet with HERNANDEZ and purchase the firearms.  On the same day, HERNANDEZ messaged the CI and stated, "Only the

sig sauer and 38 are left," and asked for $2,500 in exchange for
the firearms.

19.  The CI then asked HERNANDEZ, via Instagram, if
HERNANDEZ wanted to meet at his block.  In response, HERNANDEZ
sent the address 5633 Santa Anita Ave, Temple City, CA 91780,
and said, "This is my pad carnal."  The CI also asked HERNANDEZ
if s/he could get "2 oz of skante," in reference to
methamphetamine, and HERNANDEZ confirmed that he could.

20.  At approximately 2:39 p.m., the CI contacted HERNANDEZ
at (626) 879-3524.  HERNANDEZ told the CI that he was on his way
to Pasadena to pick up "those," in reference to the 2 ounces of
methamphetamine.  HERNANDEZ then told the CI that it would be
better and cheaper if the CI purchased a quarter pound of
methamphetamine instead of two ounces of it, and the CI agreed
to purchase this amount.  HERNANDEZ told the CI that he
previously purchased a quarter pound of methamphetamine for
$500.  The CI asked how much HERNANDEZ wanted for the
methamphetamine, and HERNANDEZ replied that he would charge the
CI the same price that he paid his source for the
methamphetamine.

21.  On this same phone call, the CI told HERNANDEZ that
s/he was near HERNANDEZ's Temple City home address, and
HERNANDEZ told the CI that he was on his way to Pasadena to pick
up the methamphetamine.

22.  At approximately 3:00 p.m., HERNANDEZ messaged the CI
through Instagram, and stated that he could meet the CI near a
24-Hour Fitness located at 377 West Woodbury Road, in Altadena,

California.  The CI responded to HERNANDEZ at approximately 3:32 p.m., and HERNANDEZ messaged him/her and stated, "You took too long spensa."  The CI then asked HERNANDEZ for his location, and HERNANDEZ replied "I'm here.  At the block."

23.  At approximately 4:00 p.m., ATF agents equipped the CI with an audio/video recording device and gave the CI $4,000 in US currency.  ATF TFO Farias established surveillance near 708 Cypress Ave., Pasadena, CA 91103.

24.  At approximately 4:06 p.m., ATF TFO Farias observed HERNANDEZ driving northbound on Cypress Ave.

25.  Based on my review of the video recording from the device attached to the CI during this controlled purchase, as well as my conversations with the CI, HERNANDEZ approached the CI's vehicle from the driver side shortly after 4:00 p.m. HERNANDEZ told the CI that his homie was a minute away, and that they wouldn't be able to pick up the firearms from his homie until 6:00 p.m.  HERNANDEZ also showed the CI pictures of two firearms on his phone and told the CI that his homie has only two left.  HERNANDEZ proceeded to tell the CI that if they went to meet his homie for the firearms after 6:00 p.m., the homie would be able to get 50 shells, or ammunition, for each one.  At approximately 4:16 p.m., HERNANDEZ told the CI that he was going to go talk to "him," in reference to his "homie," and walked away.  A few minutes later, HERNANDEZ approached the CI's vehicle from the front passenger side and told him/her to follow the Black Escalade nearby to Walgreens, which was five to ten

minutes away.  The CI then followed the Black Escalade and
HERNANDEZ's silver Toyota Camry.

26.  At approximately 4:33 p.m., the CI parked his vehicle
on Eloise Avenue in Pasadena, CA.  The CI and HERNANDEZ, who
parked nearby, exited their respective vehicles and approached
and entered the Escalade.  The third person in the Escalade,
later identified as MARTINEZ[3], told the CI to put his/her money
on the dashboard.

27.  A few minutes later a white male, later identified as
TRAUB[4], approached the front passenger side of the Escalade.
TRAUB then reached inside the vehicle and retrieved the cash
that was on the dashboard and handed the CI and MARTINEZ bags of
methamphetamine.  TRAUB told MARTINEZ, "There is a little 8 ball
there for you."

28.  At approximately 4:46 p.m., HERNANDEZ approached the
CI's vehicle from the front passenger side and told him/her that
he had his personal "one," referring to his firearm, but told
the CI that he was not selling it.  HERNANDEZ then offered to
leave his firearm with the CI while he went to pick up the other

---

[3] I identified MARTINEZ because I conducted a DMV records
check on the Black Escalade present at this controlled buy and
learned that it is registered to MARTINEZ.  I then compared
MARTINEZ's DMV photo to MARTINEZ's appearance during a
subsequent, July 5, 2023, controlled buy, and MARTINEZ's
appearance, on video, during that buy, is a match to his DMV
photo.

[4] ATF agents identified TRAUB by showing a picture of him
from the controlled buy to local Pasadena PD officers, who
recognized him and ATF agents with his name.  I then conducted a
DMV records check for TRAUB, and TRAUB's DMV photo is a match to
his appearance from this controlled buy.

firearms from his homie.  The CI told HERNANDEZ that s/he would contact him later about those firearms.

29.   After the conclusion of this deal, SAs MacLearnsberry, Starkey, Lamphere and I surveilled the CI back to the predetermined location.  At the predetermined location, SA Ghaltakhchyan retrieved: (1) the audio and video recording device from the CI; and (2) one clear plastic bag containing approximately 116 gross grams of suspected methamphetamine, which was located in a bigger yellow lemon bag.  A forensic chemist at the Drug Enforcement Administration laboratory in Vista, California later confirmed that the suspected methamphetamine was in fact 113.7 grams of methamphetamine.

### D.   June 22, 2023: HERNANDEZ Sold a Firearm Supplied by GUTIERREZ to an ATF Confidential Informant in Temple City, California

30.   On May 26, 2023, I received information from Pasadena Police Department ("PPD") that HERNANDEZ was stopped by PPD Street Crime Unit ("SCU") officers for a traffic violation on May 25, 2023.  HERNANDEZ stopped using his Instagram account @chilo_kb after this incident.

31.   On or about June 2, 2023, I found @rathergiveumab by searching Instagram for HERNANDEZ's name.  This account appeared to belong to HERNANDEZ, because the account listed the user's name as "Chilo VB Hernandez" and one of the public Instagram posts on this account showed a large "Villaboys" back tattoo. This tattoo is consistent with HERNANDEZ's back tattoo, based on booking photos that I've reviewed from HERNANDEZ's prior arrests and convictions.

32.   After locating @rathergiveumab, I instructed the CI to follow this account on Instagram.

33.   The CI began communicating with HERNANDEZ through @rathergiveumab on or about June 18, 2023.  HERNANDEZ sent a picture of a firearm to the CI through Instagram direct messages, using @rathergiveumab.  HERNANDEZ then stated, "$1300."  The CI replied and asked HERNANDEZ to hold the firearm for him/her until June 21, 2023.  HERNANDEZ confirmed that he would hold the firearm for the CI.

34.   On June 21, 2023, the CI messaged HERNANDEZ via Instagram direct messages, using @rathergiveumab.  The CI and HERNANDEZ agreed to meet on June 22, 2023, at 5:00 p.m.

35.   On June 22, 2023, HERNANDEZ sent pictures of firearms to the CI through direct messages using @rathergiveumab.  The CI then asked HERNANDEZ the price and HERNANDEZ replied, "Which one you interested in".  The CI stated that he was interested in three of the firearms, and HERNANDEZ replied, "I'm waiting for the reply ma boy the homies said he gunna get at me around 3 o'clock."  HERNANDEZ then said, "More than likely I'm sure his price for all 3 are gunna be around 4300-4500."

36.   At approximately 3:37 p.m., HERNANDEZ messaged the CI and said, "I just got off the phone rn he said tomorrow he'll bring all three to me forsure."  HERNANDEZ then offered to sell a Glock 40 to the CI and said, "I got a Glock 40 with extendo right now."  The CI asked HERNANDEZ for a location and HERNANDEZ messaged the CI the following address: "5633 Santa Anita ave temple city."

37.   Approximately 30 minutes later, the CI met me and ATF SA James Chung at a predetermined location.  We provided the CI with $4,000 in United States currency and audio and video recording and transmitting devices.

38.   At approximately the same time, ATF task force officers, SAs, and LAPD units set up surveillance near 5633 Santa Anita Ave., Temple City, CA.

39.   At approximately 4:51 p.m., the CI called HERNANDEZ at cell phone number (626) 489-8257.  The CI told HERNANDEZ that s/he was getting gas and was about 20 minutes away.  HERNANDEZ then told the CI that the address he sent is his home. HERNANDEZ also said that his homeboy called and his homeboy only has one firearm with two 50-round boxes of ammunition. HERNANDEZ also mentioned that his homeboy was far away and said that he would ask his homeboy for the address.

40.   At approximately 5:10 p.m., I, along with other ATF SAs, surveilled the CI from the predetermined location to 5633 Santa Anita Ave., Temple City, CA.

41.   At approximately 5:19 p.m., the CI called HERNANDEZ at cell phone number (626) 489-8257.  HERNANDEZ told the CI that he was standing outside and wearing a white t-shirt.  The CI responded that s/he was 10 minutes away.  HERNANDEZ then told the CI that he was next to a white Ford Ranger.

42.   At the same time, LAPD personnel observed a white Ford Ranger, with license plate number 36555A1, parked directly in front of a silver Chevrolet Malibu, with license plate number 8EIH64, on Santa Anita Avenue.

14

43.   Based on my review of audio and video recordings from a device attached to the CI during the controlled purchase, as well as my conversations with the CI, I know that:

a.   At approximately 5:33 p.m., the CI arrived at 5633 Santa Anita Avenue, in Temple City, California.

b.   Immediately after the CI arrived, HERNANDEZ opened the front passenger door of the CI's vehicle and sat in the front passenger seat.  HERNANDEZ was carrying an Old Navy paper bag when he entered the CI's vehicle.  HERNANDEZ handed this bag to the CI.

c.   While HERNANDEZ was in the CI's vehicle, HERNANDEZ and the CI discussed the CI's plan to deliver firearms, including the purchased firearm, to Mexico.

d.   The CI confirmed that the price for the firearm was $1,400, and provided this amount to HERNANDEZ in cash.

e.   After HERNANDEZ exited the CI's vehicle, I, along with other ATF SAs, surveilled the CI back to the predetermined location.  I collected the audio and video recording device and remaining cash from the CI.  I also collected the firearm, which was a Glock GMBH pistol, model 22Gen4, caliber .40, with serial number WDN473.

f.   I later learned that GUTIERREZ supplied the Glock GMBH pistol for this deal because: (1) agents saw a silver Chevrolet Malibu, with license plate number 8EIH649, registered to GUTIERREZ, present at the deal; and (2) as further detailed in Section IV.F., on July 5, 2023, GUTIERREZ sent the CI a

direct Instagram message, and when the CI asked "Whos this," GUTIERREZ responded, "You got that Glock 40 from me G."

44.   On August 1, 2023, ATF SA Tiffany Lamphere, an interstate nexus expert, examined the recovered firearm and determined that the firearm traveled in interstate commerce. She specifically determined that the Glock model 22 Gen 4, .40 caliber pistol, bearing serial number WDN473 was manufactured by Glock in Austria.  SA Lamphere therefore concluded that the firearm had to have moved in interstate commerce in order to be recovered in California.

### E.   June 23, 2023: HERNANDEZ and GALLARDO Sell Three Firearms and Ammunition to the CI

45.   On June 23, 2023, at 11:43 a.m., HERNANDEZ told the CI, by phone, that his "homeboy" said they could go meet him. The CI then told HERNANDEZ that s/he could go meet him, but that s/he needed to know for sure, because s/he doesn't want to wait. The CI also told HERNANDEZ that s/he got stuff going across the border, and s/he wanted to get "those," in reference to the firearms, and throw them in there.  HERNANDEZ replied, "for sure." HERNANDEZ then asked the CI how long it would take him/her to get there, and the CI asked for a location. HERNANDEZ told the CI that his homeboy was at his shop, and that last time HERNANDEZ went there it was about 30 to 40 minutes away from his "pad."

46.   The CI asked HERNANDEZ for the location, and HERNANDEZ said "Santa Ana, something like that."  HERNANDEZ then told the CI to hold while he asked for the address.

47.  Five minutes later, the CI called HERNANDEZ.
HERNANDEZ told the CI that his homie was just trying to be
careful.  The CI told HERNANDEZ to ask his "homie" how close he
could get to Arcadia.  HERNANDEZ replied that he will shoot the
CI's number to his homie.  HERNANDEZ then called the CI back a
few minutes later and told the CI that his "homie" asked them to
meet him "on Azusa Ave. and Covina," and added, "I think it's a
storage fool."

48.  HERNANDEZ and the CI agreed to meet the homie at Azusa
Avenue and Covina Boulevard in Covina, California, near a
storage unit business.  The CI then told HERNANDEZ that s/he
doesn't know the homeboy, and HERNANDEZ told the CI that he is
an older homie from HERNANDEZ's hood.  The CI then asked
HERNANDEZ for the price again and he said, "four total,"
referring to $4,000, and added that ammunition would be
included.  At approximately 12:53 p.m., HERNANDEZ called the CI
and told him that his "homie" was at Tacos El Gavilan at Arrow
Highway and Azusa Avenue in Azusa, California.  About a half
hour later, ATF agents observed HERNANDEZ and another man
standing in the parking lot for Tacos El Gavilan in front of a
black Kia Sedan (i.e., the **SUBJECT VEHICLE**), and near a red
Chevrolet SUV.  The **SUBJECT VEHICLE** is registered to GALLARDO,
and an image of the other man standing with HERNANDEZ at the

controlled purchase is a match to GALLARDO's DMV photograph.

 

49.   At approximately 1:26 p.m., the CI pulled into the parking lot for Tacos El Gavilan, exited his car, and approached HERNANDEZ and GALLARDO.  GALLARDO introduced himself to the CI as "Mono."  The CI and GALLARDO got into the CI's car, and the CI then counted his/her cash in front of GALLARDO.  GALLARDO asked the CI what else s/he was looking for, and the CI responded, "What else you got?"  GALLARDO told the CI that he has more stuff but wanted to "start slow."  He then told the CI to leave the money in his/her car while GALLARDO while he retrieved the firearms.  GALLARDO added, "Gotta go to the storage."  GALLARDO then exited the CI's car, and HERNANDEZ approached to speak with the CI.  HERNANDEZ told the CI that GALLARDO wanted them to go to the storage business.  HERNANDEZ then called GALLARDO and asked for the location of the storage unit.  After the call, HERNANDEZ told the CI that the storage unit was down the street, that the CI could walk there with GALLARDO, and that HERNANDEZ would wait behind.

50.   At 1:41 p.m., GALLARDO and the CI began walking towards a Public Storage business together.  Once at the storage

unit complex, GALLARDO retrieved a bag from a storage unit and handed it to the CI.  The CI and GALLARDO exchanged phone numbers, and GALLARDO told the CI that he switches his number all the time to be careful.  GALLARDO also told the CI that he has been doing "that shit" for ten years.

51.  GALLARDO and the CI exchanged phone numbers. After the controlled purchase, the CI texted the phone number that GALLARDO provided him/her and said "Gracias."  GALLARDO responded, "I got you gee."  Once the CI returned to his car, ATF agents surveilled the CI to a predetermined location, and took custody of the following: (1) a Fusion Firearms pistol (model: 1911, caliber: .38, SN#: L00268); (2) a Berretta USA Corp pistol (model: 950, caliber: .25, SN#: DAA215818); (3) a Sig Sauer pistol (model: P938; caliber: 9; SN#: 52B010428); (4) a box of 50 round 9 caliber ammunition; and (5) a box of 50 round .25 caliber PPU kind ammunition.  An ATF interstate nexus expert reviewed these firearms and determined that they moved in interstate commerce.

52.  GALLARDO is not authorized to possess a firearm or ammunition because he is a convicted felon.  GALLARDO was convicted of the following felony crimes, each punishable by a term of imprisonment exceeding one year: (1) Lewd or Lascivious Acts on a Child Under 14, in violation of California Penal Code 288(a), in the Superior Court for the State of California, County of Los Angeles, Case No. KA05278701, on or about November 2, 2001; and (2) Possession of a Controlled Substance in violation of California Health & Safety Code 11377(a), Superior

Court for the State of California, County of Los Angeles, Case No. KA117460, on or about June 7, 2018.

53. Between October 30, 2023, and December 12, 2023, the CI and GALLARDO have communicated via a recorded line to set up a deal where GALLARDO intends to sell seven pounds of methamphetamine to the CI for $8,575. This deal is set to take place on December 12, 2023, at an ATF-controlled location.

**F.   July 5, 2023: GUTIERREZ Sold the CI One Firearm and Ammunition**

54. On or about June 28, 2023, HERNANDEZ, using @rathergiveumab, sent the CI two pictures and one video of a firearm with the message, "1300*." The CI then asked HERNANDEZ to hold the firearm and stated that he/she would be able to pick it up from HERNANDEZ sometime that week.



55. On or about July 1, 2023, the CI asked HERNANDEZ if HERNANDEZ still had the firearm they discussed on June 28, 2023,

and HERNANDEZ sent him/her another picture of the firearm. HERNANDEZ then asked the CI when he/she would be able to pick up the firearm and the CI responded that he could pick up the firearm on July 5, 2023.  HERNANDEZ then asked the CI to send him half of the payment for the firearm immediately and pay the rest when he/she picked it up.  The CI replied that he/she would pay HERNANDEZ an extra $100 for holding the firearm for him/her.

56.  On July 5, 2023, the CI received an Instagram direct message from @sc_pyro24, GUTIERREZ's Instagram account.[5] GUTIERREZ sent two pictures of a firearm to the CI via Instagram direct messages, and said, "Sup bro", followed by, "Are you going to wat this one today."  The CI then replied, "Whos this" and GUTIERREZ replied, "The homie of Chilo bro."  The CI responded, "which one," and GUTIERREZ replied, "You got that Glock 40 from me G."  GUTIERREZ then told the CI, "All good bro but Chilo said you would but this one for 1400."  The CI then agreed to purchase the firearm.

57.  GUTIERREZ asked the CI, again through Instagram direct messages, if s/he would be willing to meet in South Central at a liquor store around his block.  The CI then asked GUTIERREZ where he was staying and GUTIERREZ replied, "11320 Mona Blvd Los Angeles, CA 90059.  The CI then sent his/her phone number to GUTIERREZ and GUTIERREZ replied, "ok Fs pa lmk when you want me to call you g."  The CI and GUTIERREZ agreed to meet after 5:00 p.m. that same day, July 5, 2023.

_____

[5] As discussed below, the content of the communications with this account shows that GUTIERREZ was the user of the account.

58.  Based on GUTIERREZ's statement to the CI that he sold a "Glock 40" to the CI a few days ago, which he sent via Instagram direct messages, I conducted a records check on the Silver Chevrolet Malibu, with license plate number 8EIH649, that was present at the July 5, 2023 controlled purchase, described in more detail in Section III.F.  I learned that this vehicle is registered to GUTIERREZ.  I then searched for the address provided by GUTIERREZ to the CI——11320 Mona Blvd Los Angeles, CA 90059——and discovered that this address is approximately .1 miles away from 2410 E 115th Street, Los Angeles, CA 90059 (i.e., **SUBJECT PROPERTY 1**), which is the home address listed for GUTIERREZ on the registration for his Chevrolet Malibu.

59.  At approximately 5:06 p.m., the CI messaged GUTIERREZ via Instagram direct messages, and said, "Was up my boy." GUTIERREZ responded, "Sup bro.  You going to pull up?  Ama call you rn cool?"

60.  Shortly after 5:00 p.m., ATF task force officers and Los Angeles Police Department ("LAPD") personnel set up surveillance near **SUBJECT PROPERTY 1**.  An LAPD officer observed the silver Chevrolet Malibu with license plate number 8EIH649 parked in front of 2410 E. 115th St, Los Angeles, CA 90059.

61.  At approximately 5:11 p.m., the CI received a phone call from phone number (323) 420-8840.  A male voice asked the CI if s/he was going to pull up to the meeting location.  The CI then told GUTIERREZ that s/he was still about 30 minutes away, and asked GUTIERREZ if GUTIERREZ could meet him/her at a Food 4 Less shopping center located at 11840 South Wilmington Ave, Los

Angeles, CA 90059.  GUTIERREZ agreed and told the CI to let him know when he/she was 5 minutes away and he would pull up.

62.  At approximately 5:45 p.m., the CI met with me and ATF SA James Chung at a predetermined location.  SA Chung and I provided the CI with $3,000 in United States currency and audio and video recording and transmitting devices.

63.  At approximately the same time, an LAPD officer conducting surveillance saw a Hispanic male wearing a black shirt and black shorts, and carrying a black satchel, exit **SUBJECT PROPERTY 1** and enter the Chevrolet Malibu parked nearby.

64.  Approximately 15 minutes later, I, along with other ATF SAs, surveilled the CI from the predetermined location to the Food 4 Less parking lot located at 11840 South Wilmington Ave, Los Angeles, CA 90059.  The CI parked his vehicle, and a few minutes later, I, along with other ATF SAs, observed the silver Chevrolet Malibu with license plate number 8EIH649 drive towards and park in front of the CI's vehicle.

65.  Based on my review of the audio and video recording device that was attached to the CI during the controlled purchase, as well as my conversations with the CI, I understand that:

a.   The CI received a phone call from GUTIERREZ at approximately 6:07 p.m., wherein GUTERRIEZ asked the CI where he was parked, and after the CI told GUTIERREZ that he was parked near the entrance of the Food 4 Less, GUTIERREZ told the CI that he was going to "hop in" the CI's vehicle.

b.   GUTIERREZ entered the CI's vehicle approximately one minute later, and GUTIERREZ introduced himself as "Tony." The CI confirmed with GUTIERREZ that the price of the firearm GUTIERREZ had for sale was $1,400.  GUTERRIEZ and the CI also discussed GUTIERREZ's desire to add a hidden compartment to his vehicle.  GUTIERREZ also mentioned that he gets "burners" all the time.  Based on my training and experience, "burners" is slang for firearms.

c.   While sitting in the front passenger seat of the CI's vehicle, GUTIERREZ removed one Ruger pistol with one magazine attached, and "VB" written on the side of the magazine from his black satchel and handed this pistol to the CI.  The CI then gave GUTIERREZ $1,400 for the pistol. GUTIERREZ told the CI that he would be in touch with him in the future and exited the CI's vehicle.

d.   I, along with other ATF agents, surveilled the CI back to a predetermined location, and collected the audio and video recording device, as well as the pistol, from the CI. Examination of the pistol revealed that it contained nine rounds of ammunition.

66.  On September 27, 2023, ATF SA Tiffany Lamphere, an interstate nexus expert, examined the recovered firearm and ammunition and determined that both firearms traveled in interstate commerce.  She specifically determined that: (1) the Ruger model P95, 9mm caliber pistol bearing serial number 318-15305 was manufactured by Sturm, Ruger & Co. in Arizona; (2) the six rounds of 9mm caliber ammunition with headstamp "SIG" were

24

manufactured by Sig Sauer in Kentucky or Arkansas; (3) the one round of 9mm caliber ammunition with headstamp "R-P" was manufactured by Remington Ammunition in Connecticut or Arkansas; and (4) the one round of 9mm caliber ammunition with headstamp "BLAZER" was manufactured by CCI/Speer in Idaho or by Federal Cartridge Company in Minnesota.  SA Lamphere thus determined that the pistol and ammunition had to have moved in interstate commerce to be recovered in California.

**G.    July 27, 2023: GUTIERREZ and ACEVES Sell Two Firearms to the CI for $2,600**

67.    Instagram records show that on July 19, 2023, GUTIERREZ told ACEVES "Lmk when you get stuff", and ACEVES responded by sending GUTIERREZ 17 pictures of firearms, including the below:



68.   Instagram records also show that ACEVES told GUTIERREZ, on June 17, 2023, that his address was 9050 Danbridge Street, Pico Rivera, CA 90660 (i.e., **SUBJECT PROPERTY 2**).   On November 16, 2023, ATF agents, including myself, conducted surveillance at **SUBJECT PROPERTY 2** and saw an individual matching ACEVES' appearance from his DMV photo exit **SUBJECT PROPERTY 2.**

69.   After receiving the above pictures, GUTIERREZ messaged ACEVES the following, "Ok thanks bro I'll send em out can you get me prices for them plz."   GUTIERREZ asked the price for "#131" and ACEVES replied, "12 the Berreta."   GUTIERREZ then messaged ACEVES the following, "Good morning g lmk when you get a price list I have a few people asking," and ACEVES messaged GUTIERREZ the following picture:



70.  GUTIERREZ then messaged the above pictures to other Instagram accounts, including the ATF CI's Instagram account, and asked those users if they were interested in purchasing the firearms.

71.  GUTIERREZ direct messaged the CI, "Sup bro we a got a good amount of toys if interested g lmk".  The CI responded, "What you got."  GUTIERREZ then sent several pictures of firearms, which matched the pictures of the firearms he received from ACEVES.

72.  The CI asked, "What's the prices," and GUTIERREZ provided a list of prices for the firearms.  Three days later, the CI asked GUTIERREZ to call him.  GUTIERREZ called the CI at approximately 11:26 a.m. that day.  The CI asked how many "things," or firearms, he could purchase.  GUTIERREZ told the CI that his homie meets him everywhere, and once someone wants a firearm, his homie pulls up.  The CI and GUTIERREZ then discussed a meeting day and time, and GUTIERREZ told the CI that he needed to talk to the homie first and to get the firearms ready.

73.  Between July 23 and 26, 2023, the CI and GUTIERREZ coordinated and ultimately agreed to meet at 8:00 p.m. on July 27, 2023, at a shopping center located at Atlantic Ave. and Firestone Blvd.  GUTIERREZ separately coordinated with ACEVES via Instagram direct messages for ACEVES to meet him at this same location on the same date.  In the evening of July 26, 2023, GUTIERREZ texted the CI, "Only 125 & 126 available g." The following day, the CI texted GUTIERREZ and confirmed the

meeting time.  GUTIERREZ texted the CI back, "T 2600."
GUTIERREZ then called the CI and told the CI that he had to go
talk to his lawyer, and that the CI might just meet his homie.
The CI then told GUTIERREZ to let the homie know of the
location, and GUTIERREZ said that the homie knows.

74.  At 8:17 p.m., GUTIERREZ, who was driving a Silver
Chevrolet Malibu, entered the parking lot of the shopping center
located at 4601 Firestone Blvd, South Gate, CA 90280.
GUTIERREZ parked next to the CI's car.  The CI greeted
GUTIERREZ, who was holding a grey plastic bag with the two
firearm boxes inside.

75.  GUTIERREZ handed the plastic bag and handed it to the
CI who inspected the two Ruger gun boxes.  The CI and GUTIERREZ
then discussed future firearms purchases.

76.  At 8:22 p.m., the CI and ATF agents left the
controlled purchase location, and ATF took custody of: (1) a
Ruger pistol (model: P94, caliber: 40, SN#: 340-84166) with two
magazines; and (2) a Ruger pistol (model: P90DC; caliber: 45,
SN#: 660-66491) with two magazines.

**H.  August 9, 2023: GUTIERREZ Brokers ACEVES' Sale of Four
    Firearms to the CI for $4,400**

77.  On August 2, 2023, ACEVES sent GUTIERREZ, via
Instagram direct messages, eight photos of firearms and a price
list corresponding to those firearms.  One of those firearms,
pictured below, is described in ACEVES' price list as a Taurus
G3.



78.  On August 5, 2023, the CI asked GUTIERREZ, via Instagram direct messages, "Trying to see was up for this week, got anything coming."  GUTIERREZ then sent additional firearms pictures to the CI and said, "They just got these last night I'm trying to get numbers rn but they lagging it."

79.  The CI offered to purchase multiple firearms, and GUTIERREZ ultimately agreed to sell the CI four firearms.  The CI then told GUTIERREZ that s/he could meet up the purchase the firearms on August 9, 2023.  GUTIERREZ then told the CI to specify what firearms he wanted by referencing the numbers on the pictures GUTIERREZ sent the CI.  GUTIERREZ said, "As soon as I get the numbers, I'll send them to you because shit goes flying". GUTIERREZ then messaged the CI again and said, "1100 each bro," referring to the price of the firearms.

80.  Between August 7 and 9, 2023, GUTIERREZ and the CI arranged to meet at a Food 4 Less at 11840 Wilmington Avenue, Los Angeles, CA 90059, for the firearms transaction.  GUTIERREZ stated, via Instagram direct messages, that his "homie" might switch the location, and said "I'll see what the homie says rn

hold on give me a few." GUTIERREZ ultimately confirmed that he
could meet the CI at the Food 4 Less location at 8:00 p.m. or
8:30 p.m.

81. At approximately 8:15 p.m., the CI direct messaged
GUTIERREZ and told GUTIERREZ to let him/her know what time he
will be arriving at the Food 4 Less. GUTIERREZ told the CI that
he should be there around 8:30 p.m. A few minutes later
GUTIERREZ texted the CI and said, "The homie is coming from
Pomona so give me a few bro." He then stated, "8:40ish."

82.      At 8:48 p.m., agents saw GUTIERREZ leave **SUBJECT
PROPERTY 1** in a grey Nissan Sentra. He arrived at the Food 4
Less parking lot at 8:57 p.m. and parked next to the CI's
vehicle. GUTIERREZ stayed seated, and the CI approached
GUTIERREZ and greeted him. GUTIERREZ handed the CI a grey
plastic bag containing four firearms. The CI asked GUTIERREZ
how many firearms were inside the bag, and GUTIERREZ confirmed
"four." The CI then inspected the contents of the bag, and a
UC, who was sitting in the CI's front passenger seat, approached
and greeted GUTIERREZ. The UC took the bag and placed it inside
the CI's vehicle. The CI then paid GUTIERREZ $4,400, and
GUTIERREZ counted the money. The CI and GUTIERREZ briefly
discussed future narcotics and firearms sales.

83. At 9:01 p.m., GUTIEREZ left the Food 4 Less parking
lot in the Nissan Sentra, and law enforcement observed him drive
to a Denny's located on the north side of the same parking lot.
GUTIERREZ then approached a White Infiniti sedan and spoke to
its driver. The license plate for the sedan showed that it was

registered to ACEVES.  Both vehicles then left the Denny's parking lot.

84.  After the controlled purchase, the CI and ATF agents left the Food 4 Less location, and ATF took custody of: (1) a Taurus pistol (model: G3C, caliber: 9, SN #: ABL084466) with one magazine; (2) a Kel-Tec, CNC Industries Inc. pistol (model: PF-9, caliber: 9, SN #: R1W71) with one magazine; (3) a SCCY Industries, LLC pistol (model: CPX-2, caliber: 9, SN #: C289992) with two magazines; and (4) a Polymer 80, Inc. pistol (model: PF940SC, caliber 9, SN#: unknown) with one magazine.

85.  The Taurus pistol recovered (right, below) matches the appearance of the Taurus pistol in a picture ACEVES sent to GUTIERREZ on August 2, 2023 (left, below).




86.  A valid federal firearms license is required to sell firearms in any state.  On July 27 and December 1, 2023, an ATF Industry Operations Investigator conducted a query of ATF's Firearms Licensing System, which contains information on all federal firearm licenses issued by the federal government.  The

examiner determined that GUTIERREZ and ACEVES not have a federal firearms license.

**I.   GUTIERREZ Resides at SUBJECT PROPERTY 1 and ACEVES Resides at SUBJECT PROPERTY 2**

87.   As discussed <u>supra</u>, on November 16, 2023, ATF agents, including myself, conducted surveillance at **SUBJECT PROPERTY 2**, from approximately 5:20 a.m. to 6:45 a.m.  At approximately 6:37 a.m., ATF agents observed an individual matching ACEVES' appearance from his DMV photo exit **SUBJECT PROPERTY 2**.



88.   On December 7, 2023, LAPD officers conducted surveillance at **SUBJECT PROPERTY 2**.  As discussed above, on June 17, 2023, GUTIERREZ messaged ACEVES on Instagram, stating, "send me yo addy," and ACEVES responded, "9050 Danbridge st pico rivera ca 90660," <u>i.e.</u>, **SUBJECT PROPERTY 2**.  At approximately 6:38 a.m., an LAPD officer saw ACEVES exit **SUBJECT PROPERTY 2**.

89.  On December 4 and 5, 2023, during very early morning hours, ATF agents also conducted surveillance at **SUBJECT PROPERTY 1**. ATF agents observed a middle-aged man leave **SUBJECT PROPERTY 1** in a grey Nissan Sentra that agents observed GUTIERREZ drive from **SUBJECT PROPERTY 1** to the deal location for the August 9, 2023 controlled purchase.  Further, based on my review of cell site location date for GUTIERREZ's cell phone number, which was obtained pursuant to a warrant authorized by Maria A. Audero on December 7, 2023, GUTIERREZ's cell phone has been located at **SUBJECT PROPERTY 1** during nighttime hours since approximately December 7, 2023.

**I.   Unlicensed Firearms Dealers Often Store Firearms, Ammunition, and Other Evidence of Their Criminal Activity at Their Residences**

90.  Additionally, based on my training and experience and familiarity with investigations into firearms trafficking, I know the following:

a.   Individuals involved in unlicensed firearms dealing often maintain records (including financial records, receipts, notes, ledgers, mail, tax records, and other papers) related to their crimes, and that these records are often maintained at places where the individuals can have ready access to them, including their residences. In my training and experience, I also know that individuals who have committed crimes using social media platforms, such as GUTIERREZ and ACEVES, often keep records of their crimes in digital or electronic format, such as on a cell phone, and that cell phones are often stored on their persons or in their residences.

33

b.    Individuals engaging in unlicensed firearms dealing often keep the names, addresses, and telephone numbers of their associates on their digital devices and in their residences.  They also often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residences, including in the form of calendar entries and location data.

c.    Communications between people buying and selling firearms take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the firearms between the seller and the buyer, and the negotiation of price.  In addition, it is common for people engaged in unlicensed firearms dealing to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the firearms or facilitate firearms sales.

d.    Individuals engaged in unlicensed firearms dealing often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing business, which often operates on a cash basis. Such currency is often stored in their residences.

e.    Individuals engaged in unlicensed firearms dealing often keep firearms in places where they have ready access and control, such as at their residences or in safes. They also often keep other items related to their unlicensed

34

firearms business at their residences, such as ammunition and/or tools to modify firearms.  These items are often small enough to be easily hidden and thus may be kept at an unlicensed firearms dealer's residence even if the unlicensed firearms dealer lives with others who may be unaware of his criminal activity.

### V.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[6]

1.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are

---

[6] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data

if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

2.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

3.   The search warrant requests authorization to use the biometric unlock features of a device, based on the

following, which I know from my training, experience, and
review of publicly available materials:

a.   Users may enable a biometric unlock function
on some digital devices.  To use this function, a user
generally displays a physical feature, such as a
fingerprint, face, or eye, and the device will
automatically unlock if that physical feature matches one
the user has stored on the device.  To unlock a device
enabled with a fingerprint unlock function, a user places
one or more of the user's fingers on a device's fingerprint
scanner for approximately one second.  To unlock a device
enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's
face with the user's eyes open for approximately one
second.

b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as
when a device has been restarted or inactive, has not been
unlocked for a certain period of time (often 48 hours or
less), or after a certain number of unsuccessful unlock
attempts.  Thus, the opportunity to use a biometric unlock
function even on an enabled device may exist for only a
short time.  I do not know the passcodes of the devices
likely to be found in the search.

c.   Thus, the warrant I am applying for would
permit law enforcement personnel to, with respect to any
device that appears to have a biometric sensor and falls

38

within the scope of the warrant: (1) depress the Target

Subjects' thumbs and/or fingers on the device(s); and

(2) hold the device(s) in front of their faces with their

eyes open to activate the facial-, iris-, and/or retina-

recognition feature.

4.   Other than what has been described herein, to my

knowledge, the United States has not attempted to obtain

this data by other means.

## VI.   <u>CONCLUSION</u>

91.  For all the reasons described above, there is probable

cause to believe that: (1) GUTIERREZ and ACEVES violated 18

U.S.C. § 922(a)(1)(A) (Engaging in the Unlicensed Business of

Firearms Dealing); (2) MARTINEZ and TRAUB violated 21 U.S.C.

§§ 841(a)(1), (b)(1)(A), 18 U.S.C. § 2(a) (distribution of

methamphetamine); and (3) GALLARDO violated 18 U.S.C.

§ 922(g)(1) (Felon in Possession of a Firearm).

92.  There is also probable cause to believe that the items

listed in Attachment B1, which constitute evidence, fruits, and

instrumentalities of violations of 18 U.S.C. § 922(a)(1)(A) will

be found in **SUBJECT PROPERTY 1**, as described in Attachment A-1,

**SUBJECT PROPERTY 2**, as described in Attachment A-2, on the

person of GUTIERREZ, as described in Attachment A-3, and on the

person of ACEVES, as described in Attachment A-4.  There is also

probable cause to believe that the items listed in Attachment

B2, which constitute evidence, fruits, and instrumentalities of

a violation of 18 U.S.C. § 922(g)(1) will be found on the person

of GALLARDO, as described in Attachment A-5, and in the SUBJECT

VEHICLE, as described in Attachment A-8.  Finally, there is also probable cause to believe that the items listed in Attachment B3, which constitute evidence, fruits, and instrumentalities of violations of 21 U.S.C. 841(a)(1) and 18 U.S.C. 2(a) will be found on the person of MARTINEZ, as described in Attachment A-6, and on the person of TRAUB, as described in Attachment A-7.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 12th day of
December, 2023.

_____
HONORABLE CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE